RANDALL et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 4, 1901.)

No. 32.

1. ACT TO PREVENT INJURIOUS HARBOR DEPOSITS—VIOLATION—PROSECUTION—DEFENSE—UNAVOIDABLE ACCIDENT—QUESTION FOR JURY.

In a prosecution under section 3 of the act of August 17, 1894 (28 Stat. 338), to prevent injurious deposits in New York harbor, for a deviation from a dumping place specified in a permit under the act, in which it was claimed in defense that the deviation was caused by an unavoidable accident, due to the stress of weather, the court properly left to the jury the question of fact raised thereby.

2. SAME—INSTRUCTIONS—CONSTRUCTION OF STATUTE—VIOLATION OF CONSTITUTION.

On an issue therein as to whether the deviation was caused by an unavoidable accident, due to the stress of weather,—all the cargo not having been dumped at the specified place,—the court instructed the jury that the question was whether the weather was so unfavorable that life and property would have been jeopardized in attempting to complete the dump at the specified place. *Held*, that it did not so construe the act as to require a conviction, though perils of the sea required a deviation, so as to render the statute so unjust as to violate the principles of natural justice.

In Error to the Circuit Court of the United States for the Southern District of New York.

This is a writ of error from a judgment of the circuit court for the Southern district of New York rendered upon a verdict of guilty upon an indictment against the defendants for a joint violation of section 3 of the act of August 17, 1894, to prevent injurious deposits within the harbor of New York City. 28 Stat. 338. The statute, after providing that the owner or master of dumping scows or boats must obtain a permit defining the limits within which the discharge of scows may be made, provides as follows: "And any deviation from such dumping or discharging place specified in such permit shall be a misdemeanor, and the owner and master or person acting in the capacity of master of any scows or boats dumping or discharging such forbidden matter in any place other than that specified in such permit shall be liable to punishment therefor as provided in section 1 of said act of June 29, 1888; and the owner and master or person acting in the capacity of master of any tug or towboat towing such scows or boats shall be liable to equal punishment with the owner and master or person acting in the capacity of master of the scows or boats; and further, every scowman or other employee on board of both scows and towboats shall be deemed to have knowledge of the place of dumping specified in such permit, and the owner and master or person acting in the capacity of master shall be liable to punishment as aforesaid for any unlawful dumping, within the meaning of this act or of the said act of June 29, 1888, which may be caused by the negligence or ignorance of such scowman or other employee; and, further, neither defect in machinery nor avoidable accident to scows or towboats, nor unfavorable weather, nor improper

handling or moving of scows or boats of any kind whatsoever, shall operate to release the owners and masters and employees of scows and towboats from the penalties hereinbefore mentioned." In the act of June 29, 1888, the offense is made a misdemeanor, punishable by fine or imprisonment or both. 25 Stat. 209.

The following facts appeared upon the trial to the jury: On August 29, 1899, the steamer F. N. Brown, of which the defendant Randall was master, received a permit to pass with dumper 39, of which Nelson, the other defendant, was master, containing cellar dirt, from Fortieth street to the south and east of Sandy Hook light-ship, and deposit the dirt in not less than 15 fathoms of water. The tug and tow left Fortieth street on the evening of August 29th, reaching the dumping ground about 10 o'clock p. m. Randall gave the prescribed signal, circled around the light-ship, and, assuming or believing that the scow had been emptied, started upon the return trip. The dumper contained four pockets, three of which were emptied, but about half of the contents of the fourth pocket "stuck," or adhered together, and were not discharged. Nelson probably knew this fact at the light-ship, but did not attempt to inform Randall, closed the doors of the pocket as well as he could, and intended it to be taken back with that part of the load to Fortieth street, where it would be transferred to another pocket or removed. The sea was rough, with a large ground swell from the southeast, and the night was dark. In still weather means are used to compel the dirt to leave the pocket. It is sometimes washed out with a hose, and sometimes it is started by the tug's butting against the scow. On the night in question Nelson and Randall testified that any attempt would have been dangerous, by reason of the weather, or have been futile. When tug and tow passed Ft. Lafayette, at 12:55 on the morning of August 3d, the mate of the government patrol vessel saw that the after pocket of the scow listed, boarded her, and found that it was partially filled with dirt. The tug, at Bay Ridge, changed the position of the scow so that thereafter the loaded end was forward, and upon the return trip the dirt oozed out, until when she reached Fortieth street, about 3:30 a. m., she was either empty, or had on board about 20 car loads. The entire quantity had oozed out before morning.

Peter S. Carter, for plaintiffs in error.

William S. Ball, for the United States.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. The two points upon which the counsel for the plaintiffs in error relies are that the stress of weather which prevented attempts at the light-ship to empty the pocket created an unavoidable accident, which required the court to grant a motion to direct a verdict for the defendants, and that if the terms of the statute require a conviction, although perils of the sea compel a deviation from the dumping ground, the statute is so unjust in its character as to violate the spirit of the constitution. Such a construction was not given to the statute by the circuit court. It charged the jury, in substance, that the necessities of commerce required the protection and preservation of the harbor of the chief commercial city of the country, and that an act to protect the waters of the harbor for the purposes of navigation was within the constitutional power of congress. As experience had shown the necessity of a rigid observance of prohibitory measures against the obstruction of the harbor, there was occasion for an act which would cast rigid responsibilities upon persons who permitted a violation of the statute, but that the act in question did not mean that there was no excuse in any event for a deviation from the specified dumping ground. The act required the captain of the tug, who was in the general charge of both tug and tow, to exercise

the highest diligence to prevent a deviation from the dumping place specified in the permit; and therefore he could not set up, in discharge of this obligation, defects in machinery, because the machinery could have been tested before the voyage commenced; or avoidable accidents or mere unfavorable weather, because the expedition need not have been entered upon in such weather; or lack of seamanship). The same duty of diligence was imposed upon the captain of the scow, to see that the load was discharged at the proper time and place; and the question of fact was submitted to the jury as to each defendant, whether he did on the night in question all that diligence required.

Upon the precise point in the case,—the alleged combination of an accident and stress of weather which prevented the use of means to overcome the accident,—the court charged that if the master got into trouble, and there was such unfavorable weather that he could not correct the trouble, that would be a question for the consideration of the jury. The court further charged, upon the general subject of neglect or inability to discharge the load at the specified place, and upon the particular reason which was presented by the defendants for a return to the harbor with a dumper which had not been emptied, as follows:

"Whether, holding these men to a rigid accountability, which means that they should use that high degree of care in doing this work that its importance required, has either of them done some act which was negligent under the circumstances, or omitted to do some act the omission of which was negligent under the circumstances? There has been some suggestion here with reference to the unfavorableness of the weather. I suppose you would have to give a common-sense interpretation to that expression. A man cannot come in and say that he did not do this because the weather was not favorable for doing it. The question is whether, under all the circumstances of the case, the weather was so unfavorable that * * * life and property would be jeopardized in attempting to maneuver out in the water. You have heard what has been said by the captain of the tug and by others as to the condition of the water. It is for you to determine, under all the circumstances of the case, whether, for instance, it was unsafe for them to have remained out there and tried to wash out this pocket, or to have done any of these other acts which sometimes are done for the purpose of bringing about the complete emptying of the scow."

That there was a deviation, and that all the cargo was not dumped at the specified place, was admitted; and the question before the jury was whether either of the two defendants was responsible for the deviation, by omitting to do what diligence required him to do in order to avoid such a result. The question of the violation of the statute by each defendant was presented to the jury, and there was no suggestion that the violation by one was a violation by the other, and that therefore both could be found guilty for the act of one alone. The construction of that part of the statute which declares that the master shall be liable for any unlawful dumping which may be caused by the ignorance of the scowman or other employé was not before the court. We see no reason to conclude that the questions of fact in regard to a violation of the statute should have been taken from the jury, or that the construction which was given to the statute violated the principles of natural justice. The judgment of the circuit court is affirmed.