## UNITED STATES of America

v.

**M/V BIG SAM, in rem, Tri-Capt, Inc., Zito Towing, Inc., ABC Insurance Co., T/B Butane, in rem, Keith S. Edwards, and Water Quality Insurance Syndicate.**

**Civ. A. No. 78-86.**

United States District Court,
E. D. Louisiana.

May 9, 1978.

---

Gerald J. Gallinghouse, U. S. Atty., Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., James A. Lewis, Admiralty & Shipping Sec., Dept. of Justice, Washington, D. C., for plaintiff U. S.

Francis Emmett, New Orleans, La., for defendants Keith S. Edwards d/b/a Delta Barge Line, Water Quality Ins. Syndicate, and Keith S. Edwards d/b/a Delta Barge Line as claimant of the Barge BUTANE.

Normand F. Pizza, Reuter & Reuter, New Orleans, La., for defendants M/V BIG SAM and Zito Towing, Inc.

Poitevent & Hanemann, John Poitevent, Trial Atty., New Orleans, La., for Tri-Capt. Inc.

Phelps, Dunbar, Marks, Claverie & Sims, Leonard N. Bouzon, Thomas J. Wagner, Trial Attys., New Orleans, La., for Mission Ins. Co.

HEEBE, Chief Judge.

This cause came on for hearing on a previous day on the (1) motion of defendants M/V Big Sam and Zito Towing, Inc., to enjoin seizure of vessel or in the alternative to set bond; (2) motion of defendants M/V Big Sam and Zito Towing, Inc., to dismiss causes of action one and two against the M/V Big Sam; (3) motion by defendant Zito Towing, Inc., to dismiss causes of action one, two and three against Zito Towing, Inc.; (4) motion of defendants Keith S. Edwards d/b/a Delta Barge Line, Water Quality Insurance Syndicate, and Keith S. Edwards d/b/a Delta Barge Line as claimant of the Barge Butane to dismiss or for summary judgment.

The Court, having heard the arguments of counsel and having studied the legal memoranda submitted by the parties, is now fully advised in the premises and ready to rule. Accordingly,

IT IS THE ORDER OF THE COURT that the motion of defendants M/V Big Sam and Zito Towing, Inc., to enjoin seizure of vessel or in the alternative to set bond, be, and the same is hereby, GRANTED to the extent that seizure of the vessel is enjoined but only if defendants M/V Big Sam or Zito Towing, Inc., post security of $400,000.00.

IT IS THE FURTHER ORDER OF THE COURT that the motion of defendants M/V Big Sam and Zito Towing, Inc., to dismiss causes of action one and two against the M/V Big Sam, be, and the same is hereby, DENIED.

IT IS THE FURTHER ORDER OF THE COURT that the motion of defendant Zito Towing, Inc., to dismiss causes of action one, two and three against Zito Towing, Inc., be, and the same is hereby, DENIED.

IT IS THE FURTHER ORDER OF THE COURT that the motion of defendants Keith S. Edwards d/b/a Delta Barge Line, Water Quality Insurance Syndicate, and Keith S. Edwards d/b/a Delta Barge Line as claimant of the Barge Butane to dismiss or for summary judgment, be, and the same is hereby, DENIED.

### REASONS

This action was brought by the United States in admiralty to recover civil penalties and the expense of oil removal resulting from a discharge of oil by T/B Butane after a collision on April 25, 1975, between M/V Big Sam and T/B Butane in the Mississippi River.

Defendant M/V Big Sam is a tugboat of 155 gross tons, presently owned by defendant Zito Towing, Inc. Defendants Tri-Capt, Inc., and Zito Towing, Inc., were and presently are incorporated and doing business in Louisiana and were the owner, operator and charterer of M/V Big Sam on April 25, 1975. Defendant T/B Butane is a barge of 1,324 gross tons, presently owned by defendant Keith S. Edwards. Defendant Keith S. Edwards d/b/a Delta Barge Line was and now is an individual domiciled in the State of Texas and doing business in Louisiana and was the owner and operator of T/B Butane on April 25, 1975.

The complaint of the United States alleges six causes of action. The first cause of action alleges that defendants M/V Big Sam, Tri-Capt, Inc., and Zito Towing, Inc.,

and their officers, agents and employees were negligent in the operation of M/V Big Sam, that the negligence caused the discharge of oil into the river, and that the United States is entitled to damages for the expense of oil removal ($278,648.36). The second cause of action alleges that M/V Big Sam and T/B Butane are liable under the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 407, 411–412, for, respectively, causing a discharge and discharging of refuse matter (oil) into the navigable water of the United States and that both are liable in damages for the expense of removal and the M/V Big Sam is additionally liable for a penalty from $500.00 to $2,500.00 to be fixed by the Court. The third cause of action alleges liability by all defendants for plaintiff's expense of oil removal under the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251, et seq., arising against defendants T/B Butane and Keith S. Edwards d/b/a Delta Barge Line for discharge of oil into navigable waters and against defendants M/V Big Sam, Tri-Capt, Inc., and Zito Towing, Inc., for causing oil to be discharged in navigable waters. The fourth and fifth causes of action are brought pursuant to the Louisiana Direct Action Statute, LSA–R.S. 22:655, against ABC Insurance Company and Water Quality Insurance Syndicate, the Protection and Indemnity Insurers respectively, of M/V Big Sam and its owners and operators and of T/B Butane and its owners and operators on April 25, 1975, against the risk of claims alleged in the complaint, for the expense of removal of oil from the river. The sixth cause of action seeks a $500.00 penalty against Tri-Capt, Inc., for failure of the operator of the M/V Big Sam to hold a license for the section of the river around mile 103 AHOP in violation of 46 U.S.C. § 405.

1. The causes of action against the M/V Big Sam.

While the vessel M/V Big Sam has three causes of action alleged against it (negligence [maritime tort], Refuse Act violation [33 U.S.C. § 407], and violation of Federal Water Pollution Control Act Amendments of 1972 [33 U.S.C. § 1251, et seq.]), its motion is to dismiss only the negligence and Refuse Act claims. Since it does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," these causes of action cannot properly be dismissed. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■ a. The negligence claim alleges that the M/V Big Sam negligently collided with T/B Butane and caused the discharge of an estimated 210,000 gallons of crude oil from T/B Butane into the Mississippi River. Defendants deny that any such cause of action or right of action exists.

■ In evaluating these contentions, we observe that a cause of action for negligence traditionally has four elements:

1—A duty or obligation recognized by the law requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks.

2—A failure on his part to conform to the standard required.

3—A reasonable close causal connection between the conduct and the resulting injury. This is what is commonly known as "legal cause," or "proximate cause."

4—Actual loss or damage resulting to the interests of another.

See, Prosser, Law of Torts, § 30 (4th Ed. 1971).

While it is not clear which element or elements the defendants contend to be legally nonexistent, the law seems to embody all of these elements.

■ First, there is the question of whether or not there is a duty under law by a vessel operating on the navigable waters of the Mississippi River to use due care with respect to the United States in avoiding oil spillage which the United States might become liable to clean up. Both existing jurisprudence and wise public policy dictate this Court's conclusion that the United States is owed such a duty. As stated in State Department of Fish and Game v. S. S.

*Bournemouth*, 307 F.Supp. 922, 929 (C.D. Cal.1969):

> "Oil pollution of the nation's navigable waters by seagoing vessels both foreign and domestic is a serious and growing problem. The cost to the public, both directly in terms of damage to the water and indirectly of abatement is considerable. In cases where it can be proven that such damage to property does in fact occur, the governmental agencies charged with protecting the public interest have a right of recourse in rem against the offending vessel for damages to compensate for the loss."

■ While the United States does not own the waters of the Mississippi River into which the oil was spilled, the federal government does have constitutional and statutory responsibility to preserve, protect and maintain the country's navigable waters, including the Mississippi River. This includes the "inherent power to protect the public welfare by bringing common law suits" for damages for oil pollution, recognized in *State of Maryland v. Almerada Hess Corp.*, 350 F.Supp. 1060, 1066–1067 (D.Md.1972). "The federal courts have long considered oil pollution as a maritime tort for which damages may be awarded." *American Waterways Operators, Inc. v. Askew*, 335 F.Supp. 1241, 1247 (D.Fla.1971), *rev'd on other grnds.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280, *reh. den.*, 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162. These cases are predicated on the existence of proximately caused actual damage to the United States.

■ Defendant contends that there would be an inconsistency between the existence of a maritime tort for oil spillage and the delineation of the rights of the United States in 33 U.S.C. § 1321(g), setting third party owner or operator liability at $100.00 per gross ton of the vessel, or $14,-000,000.00, whichever is lesser. However, this contention flies in the face of 33 U.S.C. § 1321(*o*), which clearly preserves any existing obligations for damages in the following language:

> "(1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.
>
> "(3) Nothing in this section shall be construed as affecting or modifying any other existing authority of any Federal department, agency, or instrumentality, relative to onshore or offshore facilities under this chapter or any other provision of law, or to affect any State or local law not in conflict with this section."

An examination of the legislative history of the Federal Water Pollution Control Act Amendments of 1972 found at 1972 U.S. Code Cong. & Admin.News, p. 3668, 3731–3733, indicates that "The portions of this section [Section 311—Oil and Hazardous Substance Liability] that deal with clean-up liability for oil discharges are taken from existing law. Modifications add liability for the clean-up of any hazardous material discharged on to the navigable waters." The Committee Report further states that "We have examined the issue of whether there should be financial limitations of liability for the costs of removal of hazardous polluting substances, and we have concluded that there should be no liability limitations imposed. * * * [H]azardous substances heretofore treated in a separate section should be subject to the same control mechanism applied to oil."

■ b. The United States also brought an action in rem against M/V Big Sam for alleged discharge of refuse matter into the navigable waters in violation of the Refuse Act of 1899, 33 U.S.C. § 407. In pertinent part, the statute reads:

> "It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited . . . from or out of any ship, barge, or other floating craft of any

kind . . . any refuse matter of any kind or description whatever . . . into any navigable water of the United States . . . ."

The liability of vessels engaged in violations of this statute is set forth in the second sentence of 33 U.S.C. § 412, which in pertinent part reads as follows:

"And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408 and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft . . . and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

█ Defendant's contention that *United States v. Beatty, Inc.*, 401 F.Supp. 1040 (W.D.Ky.1975), requires dismissal because of the absence of an indictment or information against the M/V Big Sam is a misinterpretation of that case. The *Beatty* decision related to prosecutions under 33 U.S.C. § 411 and properly held that such criminal prosecutions cannot proceed in the absence of an indictment or information. Here, the action is noncriminal and is brought under 33 U.S.C. § 412 for damages and civil penalties. This in rem proceeding does not require an information or indictment. *The Scow "6–S,"* 250 U.S. 269, 272, 39 S.Ct. 452, 63 L.Ed. 977 (1919); *The Barbara Cates,* 17 F.Supp. 241, 243–244 (E.D.Pa.1936); *United States v. M/V Martin,* 198 F.Supp. 171, 176 (S.D.Ill.1961), aff'd 313 F.2d 851 (7th Cir. 1963).

Accordingly, causes of action one and two against the M/V Big Sam should not be dismissed.

2. The causes of action against Zito Towing, Inc.

· While Zito Towing, Inc., has moved for dismissal of causes of action one, two and three against it, the complaint only names Zito Towing, Inc., as a defendant in causes one (which alleges maritime tort) and three (which alleges violation of the Federal Water Pollution Control Act Amendments of 1972).

█ a. Zito Towing, Inc., is the alleged owner of the tugboat M/V Big Sam. The existence of vessel owner liability for the tort of oil pollution has been recognized in the jurisprudence. *State of Maryland, Dept. of N. Res. v. Amerada Hess Corp.,* 350 F.Supp. 1060 (D.Md.1972); *Burgess v. M/V Tamano,* 370 F.Supp. 247 (D.Me.1973), aff'd 559 F.2d 1200. The availability of such a remedy furthers the public interest by serving as an added inducement for such owners to exercise due care. *See, Potomac Riv. Ass'n, Inc. v. Lundeberg Md. Sea. Sch., Inc.,* 402 F.Supp. 344, 356–357 (D.Md.1975). The clear public interest in avoiding pollution from oil spills has already been noted in *State Department of Fish and Game v. S.S. Bournemouth,* 307 F.Supp. 922, 929 (C.D. Cal.1969).

b. Zito Towing, Inc., has also alleged itself free of liability under the Federal Water Pollution Control Act Amendments of 1972 by virtue of the fact that there was a finding in *Naptha Barge Company v. Continental Navigation Company,* CA No. 75–1281, Section H, Eastern District of Louisiana, that the owner, *pro hac vice*, operator and claimant of the M/V Big Sam was Tri-Capt, Inc., and that there was no finding in that case that there was willful negligence or willful misconduct within the privity or knowledge of Zito Towing, Inc. However, the *Naptha Barge* case was simply a collision damages suit between private parties and the United States did not participate in the proceedings of that case. That suit thus did not address the claims of the United States, if any, under the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251, *et seq.*, and particularly under section 1321(g).

To the extent that defendant seeks by this motion to obtain collateral estoppel or res judicata against the United States, we note that those are affirmative defenses which normally are raised by way of an-

swer to the complaint. F.R.Civ.P. Rule 8(c). However, in the interest of efficient and expeditious judicial administration of justice, a defense such as res judicata or collateral estoppel may be raised either by motion or in the answer. 5 Wright & Miller, Federal Practice and Procedure, § 1277 (1969); *Hartmann v. Time, Inc.*, 166 F.2d 127, 131 n.3 (3rd Cir. 1947); *Thistlethwaite v. City of New York*, 362 F.Supp. 88, *aff'd* 497 F.2d 339, *cert. den.* 419 U.S. 1093, 95 S.Ct. 686, 42 L.Ed.2d 686 (1974). In allowing such defenses to be adjudicated on motion rather than by way of answer, the court should give all parties the opportunity to present pertinent evidentiary material to the court. 5 Wright & Miller, *supra* at p. 331. In the instant case, the government attorney expressly stated during oral argument that he wishes to present evidence with respect to the res judicata or collateral estoppel issues but cannot do so until discovery has progressed further. At the present time, this case is quite young, having been filed on January 10, 1978. Until discovery has reached a stage where all parties have had a fair opportunity to develop the evidence pertinent to the issues of collateral estoppel or res judicata, this Court cannot properly address those issues. *Collins v. PBW Stock Exchange, Inc.*, 408 F.Supp. 1344 (D.Pa.1976).

Accordingly, the causes of action against Zito Towing, Inc., cannot be properly dismissed.

3. Motion to enjoin seizure of M/V Big Sam or in the alternative to set bond at $31,000.00.

a. Existence of maritime liens.

■ Defendants M/V Big Sam and Zito Towing, Inc., move to enjoin seizure of the M/V Big Sam on grounds that there is no maritime lien against the vessel for the causes of action alleged. Defendants are mistaken.

With respect to the alleged maritime tort of oil pollution, the existence of a maritime lien has been expressly recognized in *State of California v. S.S. Bournemouth*, 307 F.Supp. 922, 926 (C.D.Cal.1966), as follows:

"Defendant takes the position that only two types of maritime torts create maritime liens: collision claims and personal injury claims. . . . The court finds no merit in defendant's position and is of the opinion that the tort in question is maritime in nature; that a maritime lien against the Bournemouth arises in favor of the plaintiff which will support an admiralty action in rem, as a matter of general maritime law without the aid or necessity of a statutory lien. . . ."

■ With respect to the alleged violation of the Refuse Act, there is a summary proceeding in rem against the vessel pursuant to 33 U.S.C. § 412. As observed in *The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753 (1867), "in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing to be carried into effect by legal process."

■ With respect to the alleged violation of the Federal Water Pollution Control Act Amendments of 1972, there arises a statutory lien pursuant to 33 U.S.C. § 1321(g) as to the vessel causing the discharge from another vessel. This lien is maritime in nature, in light of the fact that it arises out of conduct which is peculiarly maritime (*viz.*, spillage of oil on the navigable waters in the course of shipping the oil in vessels on the navigable waters). *See* Gilmore & Black, The Law of Admiralty, § 9–20 (2d Ed.1975), which says at p. 629 n.95b:

"The Federal Water Quality Improvement Act of 1970 . . . gives maritime lien status to actions by the United States to recover its costs for cleaning up pollution of navigable waters resulting from the discharge of oil and other substances. The statute does not characterize the lien which should no doubt be categorized as a tort lien."

b. Amounts of liens.

■ While the Court concludes that there are alleged maritime liens against the M/V Big Sam arising out of each of plain-

tiff's causes of actions against that vessel, the amounts of the liens are not the same in all instances. Under the Federal Water Pollution Control Act Amendments, 33 U.S.C. § 1321(g), the lien would be limited to $31,000.00. However, under the maritime tort and Refuse Act theories of the complaint, the lien would equal the amount of the costs shown by the government to be reasonable plus perhaps interest and costs (subject to the maximum set by the value of the vessel and its cargo under 46 U.S.C. § 183). *Burgess v. Tamano,* 564 F.2d 964, 983 (1st Cir. 1977). In light of the government's claim that actual removal costs were $278,648.36, the amount of the lien for either of these causes of action could reasonably equal that amount. The amount of security which the plaintiff would seek in lieu of exercising seizure is $400,000.00, which is reasonable under Rule E(5)(a)(i) of the supplemental Rules for Certain Admiralty and Maritime Claims, which authorize the maximum value of a special bond to be set at twice the amount of plaintiff's claims.

■ Defendants request that seizure not be allowed on grounds of the contention that there is no maritime lien and the contention that seizure would work an irreparable hardship on defendant. As already shown, the former contention has no merit. As to the latter contention, if defendant posts a bond in the amount of $400,000.00, then seizure will not be necessary. Because liens are alleged under maritime tort law and the Refuse Act, the security posted cannot merely be limited to the $31,000.00 which would suffice if the only alleged lien were under the Federal Water Pollution Control Act Amendments.

4. Motion to dismiss or for summary judgment in favor of defendants Keith S. Edwards d/b/a Delta Barge Line and Water Quality Insurance Syndicate.

Keith S. Edwards d/b/a Delta Barge Line is the owner of the T/B Butane, a tank barge. Water Quality Insurance Syndicate is the oil pollution insurer of the T/B Butane with respect to liabilities of vessels and owners as provided by the Federal Water Pollution Control Act Amendments of 1972.

The T/B Butane was the face barge in a string of three barges being pushed by the M/V Letha C. Edwards (a tug) in the Mississippi River at the time of the collision which caused the oil spill in question. The T/B Butane was a dumb barge without motive power or crew and entirely in control of the M/V Letha C. Edwards, which was operated by Naptha Barge Company, a Texas corporation. The collision between M/V Big Sam (under the operation of Tri-Capt, Inc.) and the flotilla including T/B Butane occurred in daylight on April 25, 1975.

Defendants Edwards and T/B Butane contend that they are entitled to have the complaint dismissed and/or summary judgment on all claims asserted under the Federal Water Pollution Control Act of 1972 (1) because it has been judicially established that the spill from the Butane was caused by ". . . an act or omission of a third party," and (2) because the Butane was a dumb barge under the control of a tug when the collision and spill occurred and she, the Butane, could not possibly be at fault, as no conceivable facts could render her so.

■ The motion to dismiss certainly cannot be granted because the complaint does indeed set forth allegations which, if proved, would comprise a valid claim under the Federal Water Pollution Control Act. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). It is not inconceivable that a dumb barge may have contained some defect of design, loading, or otherwise which could have resulted in needless spillage as a result of a collision.

With respect to the claim for summary judgment, the United States has expressly requested an opportunity to engage in discovery to ascertain whether or not there is any merit to defendant's assertion that it has a defense under 33 U.S.C. § 1321(f). As already noted above, the Court is of the opinion that at the present time the govern-

ment has not had ample opportunity to develop any pertinent evidence it may wish to present on the issues of collateral estoppel or res judicata with respect to the *Naptha Barge* proceeding in which it was not a party. Discovery in the instant proceeding should proceed forthwith, and defendants may wish to renew their summary judgment motion at a later point.

Defendants contend that their participation in the instant proceedings necessarily will result in undesirable multiplicity of litigation because of their allegedly inevitable ability to recover from the United States in the Court of Claims any amount the United States may recover from them in the instant action. This argument is not cogent at the present time because of the dispute as to whether defendants qualify under 33 U.S.C. § 1321(i)(1) as an owner or operator who "acts to remove" a spill, an issue which cannot on the present state of the record be definitively decided in defendants' favor. Further, defendants' reliance on the *Naptha Barge* decision as to which there has not been ample opportunity for the government to do discovery precludes disposition of this question at the present time.

The additional contentions of the defendants are that there can be no liability under the Rivers and Harbors Act of 1899 because (1) that Act was superseded by the Federal Water Pollution Control Act of 1972, (2) the 1899 Act only applies to refuse which hinders navigation or anchorage, and (3) the 1899 Act requires proof of fault, which is allegedly impossible in the instant case.

■ (1) With respect to defendants' first contention, this Court concludes that the Rivers and Harbors Act of 1899 (also called Federal Refuse Act of 1899) still retains vitality. Specific support for the proposition that the Federal Water Pollution Control Act Amendments of 1972 do not supersede the 1899 Act is provided by *United States ex rel. Scott v. United States Steel Corp.*, 356 F.Supp. 556, 559 (N.D.Ill. 1973), where the court says:

"Defendant argues that the Federal Refuse Act has been superseded by the 1972 amendments to the Federal Water

Pollution Control Act . . . . . Suffice it to say that the 1972 amendments did not purport to repeal the Federal Refuse Act which, on the contrary, was specifically preserved by the 1970 amendments to the Federal Water Pollution Control Act (33 U.S.C. § 1174(2)) and by Section 511(a)(2)(B) of the 1972 amendments (P.L. 92–500)."

The fact that the 1972 Act expressly makes reference to the 1899 Act in its savings clause (33 U.S.C. § 1371) substantially eviscerates defendants' contention that the newer legislation should be viewed as an amendment of the older. Indeed, the very case cited by defendant in support of the proposition that newer legislation should be viewed as amending older legislation says that that general rule applies when "there is no statutory language which makes any cross-reference," which is just the contrary of the situation before this Court. *Hines, Inc. v. United States*, 551 F.2d 717, 725 (6th Cir. 1977). *Also see United States v. United States Steel Corporation*, 328 F.Supp. 354, 358 (N.D.Ind.1970), where a district court rejected the argument that it should "accommodate" or "reconcile" the 1899 Act with the 1970 Federal Water Pollution Control Act in a manner which would in effect repeal the 1899 Act.

The specific language of the 1972 Act provides that "This chapter shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter . . . . ." 33 U.S.C. § 1371(a)(1). While not considering this specific language, the United States District Court for the Eastern District of Virginia reached the conclusion that the 1972 Act is the sole available basis upon which the federal government may seek recovery of clean-up costs, a decision which is presently on appeal to the Fourth Circuit. *Complaint of Steuart Transportation Co.*, 435 F.Supp. 798, 807–808 (E.D.Va.1977), says:

"As to the United States' claim for clean-up costs, the Court holds that FWPCA acts as a limit to that claim regardless of

the basis on which it is made. By enacting FWPCA, Congress comprehensively established standards and limits of liability for oil spill cleanup costs. The Government will not be permitted to present a claim for such costs under general maritime law, common law, or other statutes. *See* 3 Benedict on Admiralty, § 112; *contra* Gilmore & Black, The Law of Admiralty 828–29."

There does not appear to be any basis either in statutory language of the 1972 Act or in its legislative history for the Court's conclusion that the 1972 Act provides the sole basis upon which the United States may recover actual clean-up costs it expends. Rather, liability for actual costs of removal under 33 U.S.C. § 1321(f) is limited to discharges in violation of 33 U.S.C. § 1321(b)(3), which prohibits only discharges in "harmful quantities as determined by the President under paragraph (4)" of subsection b. Likewise, third party liability under 33 U.S.C. § 1321(g) is limited to violations of subsection (b)(3). Not only are these violations limited to infractions of presidential regulations, but furthermore section (h)(2) expressly provides that "The liabilities established by this section shall in no way affect any rights which . . . (2) the United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance." 33 U.S.C. § 1321(h)(2). The language of section (h)(2) expressly contradicts the conclusion of the court in *Steuart Transportation* that "The Government will not be permitted to present a claim for such costs under general maritime law, common law, or other statute."

The purpose of the 1972 Act is clearly to provide a basis on which the United States can obtain a recovery, not eliminate already existing remedies to the government, including those under prior statutes. For example, the legislative history of the 1972 Act shows that Congress was specifically aware of and wished to keep in place as an effective enforcement medium the Refuse Act of 1899. Senator Griffin remarked to Senator Muskie, floor manager of the 1972 Act:

"During the last 2 years there have been some 300 criminal convictions under section 13 of the Refuse Act and over 120 civil actions most of which resulted in the defendants either stopping the dumping or agreeing to institute pollution control programs. On the other hand, it is my understanding there have been only a handful of prosecutions for violation of water quality standards since the Federal Water Pollution Control Act was enacted.

"In view of this—a fact recognized by the conferees—it is inconceivable that the Senate would want to emasculate the best available enforcement device now available—the Refuse Act."

*United States v. Rohm & Haas Company*, 500 F.2d 167, 171 n.2 (5th Cir. 1974) (118 Cong.Rec.S. 16882, October 4, 1972).

Further, when Congress wanted to specifically relegate particular discharges to the 1972 Act in derogation of previous statutes, it did so explicitly. For example, 33 U.S.C. § 1371(b) expressly states that discharges of pollutants into the navigable waters subject to certain acts of 1910 and 1888 will be subject to the 1972 Act rather than the older acts except as to effect on navigation and anchorage.

Furthermore, while there are express limitations in the statutory language of 33 U.S.C. §§ 1321(f) and (g) on the extent of liability imposed under the causes of action created by those subsections, there is no inconsistency in finding that those limitations embodied in 33 U.S.C. §§ 1321(f) and (g) do not pertain to the entirely separate causes of action created by the 1899 Act or by common law. It is not at all infrequent under the law that the same or similar conduct may subject one to civil suit under various causes of action, each of which may in turn be subject to different defenses and different specific elements of quantum of damages. For example, conduct violative of the Fair Housing Act of 1968 (42 U.S.C. §§ 3601–3631) may also violate one of the general provisions protecting civil rights (e. g., 42 U.S.C. § 1981 or 42 U.S.C. § 1982).

Or conduct violative of the Securities Act of 1933 may also state a cause of action under the Securities Exchange Act of 1934. The availability of such alternative remedies in the 1899 Act or common law and the 1972 Act is not an inconsistency in the law and does not fall within the purview of "inconsistency" envisioned by Congress in 33 U.S.C. § 1371(a)(1).

Had Congress so intended, it could easily have provided that suit under 33 U.S.C. §§ 1321(f) and (g) is the exclusive grounds of civil liability in favor of the United States for the conduct here at issue. Congress certainly knows how to use the word "exclusive" when that word captures its intent. *See, e. g., Longshoremen's and Harbor Workers' Compensation Act*, § 5, 33 U.S.C. § 905. Congress did not express the concept of exclusivity in the 1972 Federal Water Pollution Control Act.

Accordingly, this Court concludes that the 1899 Act is still a significant source of remedy for governmental expenditures for oil spill removal.

██ (2) Defendants' contention that oil cannot qualify as refuse under the 1899 Act has been expressly repudiated by the United States Supreme Court. As stated in *United States v. Standard Oil Co.*, 384 U.S. 224, 229–230, 86 S.Ct. 1427, 1430, 16 L.Ed.2d 492 (1966), "There is nothing more deserving of the label 'refuse' than oil spilled into a river." Defendants' reliance on the one paragraph per curiam opinion of the Fifth Circuit in *Guthrie v. Alabama By-Products Co.*, 328 F.Supp. 1140 (N.D.Ala.1971), *aff'd* 456 F.2d 1294 (5th Cir. 1972), *cert. den.* 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973), *reh. den.*, 411 U.S. 910, 93 S.Ct. 1524, 36 L.Ed.2d 201 (1973), is misplaced. As stated by the United States Supreme Court in *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 671–672, 93 S.Ct. 1804, 1815, 36 L.Ed.2d 567 (1973):

"The lower courts have almost universally agreed, as did the courts below, that § 13 is to be read in accordance with its plain language as imposing a flat ban on the unauthorized deposit of foreign substances into navigable waters, regardless

of the effect on navigation. [Numerous citations omitted]; *contra, Guthrie v. Alabama By-Products Co. . . . .*"

Furthermore, the United States pleads and contends that it is prepared to prove that T/B Butane's discharge of 210,000 gallons of crude oil constituted an interference with navigation, so that if the question of interference with navigation is in issue, there is genuine factual dispute with respect to it, precluding summary judgment.

██ (3) The defendants dispute the government's contention that the alleged violation of the Rivers and Harbors Act of 1899 imposes liability without fault. Unfortunately for defendants, the Fifth Circuit has expressly held with regard to sections 408 and 412 (33 U.S.C. §§ 408, 412) that "Together these statutes have been construed to impose strict liability." *United States v. Tug Colette Malloy*, 507 F.2d 1019, 1022 (5th Cir. 1975). However, the Fifth Circuit's opinion does go on to say that if a defendant can show that another party is solely at fault in causing an accident, then a defense is established. *Id.* Defendants' citation of *United States v. Raven*, 500 F.2d 728 (5th Cir. 1974), is inapposite. The language of Chief Judge Brown that "the duty to pay is confined to those who negligently cause the obstruction" (*Id.* at 733) had reference to the duty to mark and remove sunken vessels imposed under 33 U.S.C. § 409 and was made in the context of a criminal prosecution, whereas the instant proceedings relate to 33 U.S.C. §§ 407 and 412 and are civil rather than criminal. As plainly noted in *United States v. The TERRY E. BUCHANAN, Etc.*, 138 F.Supp. 754, 755–756 (S.D.N.Y.1956):

[S]tatutes prohibiting the dumping of refuse into harbors have been held to impose liability regardless of negligence or intent on the part of the ship's owner or master. In *The Colombo,* 2 Cir., 1930, 42 F.2d 211, a ship had leaked oil into the harbor because of the negligence of one of the seamen. The Court held that the fact that the master or owner had not authorized the unlawful act did not prevent liability. *See also The J. Rich*

*Steers,* 2 Cir., 1915, 228 F. 319; *The Scow No. 36,* 1 Cir., 1906, 144 F. 932. In *The President Coolidge,* 9 Cir., 1939, 101 F.2d 638, this rule of strict liability was followed where a Chinese cook dumped refuse over the side of a ship in direct contravention to his employer's orders. The courts have upheld these strict liability statutes [viz., 33 U.S.C. §§ 407 or 408, together with 412] because of the government's power to enact laws for the protection of the general welfare.